DECISION AND JUDGMENT ENTRY *Page 2 
{¶ 1} This is an appeal from a judgment of the Huron County Court of Common Pleas, Juvenile Division, that terminated the parental rights of appellants, Sharen and Michael G., and granted permanent custody of their children, River G., Jordan G., Elijah G., Serah G., Simon G., Abba G., Joni G., Samson G., Michael G., and Sharen G., to appellee the Director of the Huron County Department of Job and Family Services ("HCDJFS"). In addition, the court ordered that Mercy Anne G. remain in the temporary custody of the Director of the HCDJFS.
 {¶ 2} Mr. and Mrs. G.[1] were the adoptive parents of ten of the above named children. At the time that the proceedings were initiated in the court below, appellants were in the process of adopting Mercy Anne and had legal custody of her, but that adoption had not been completed. As a result, appellee the Cradle Society, the legal guardian of Mercy Anne, is a party to these proceedings.
 {¶ 3} In early August 2005, Jo Johnson, an investigator in the Children Services Unit of the HCDJFS, received a complaint that appellants' children were being kept in *Page 3 
cages. Upon determining that an investigation was needed, Johnson discovered that a number of the children had been diagnosed with reactive attachment disorder ("RAD")[2]. She then checked resources and contacted various professionals to determine if keeping children in cages was an appropriate treatment for children with RAD. Johnson could not find any evidence to support such treatment. She then went to appellants' home on September 9, 2005, to continue her investigation. The second floor of appellants' home contains four bedrooms. Johnson first saw the room in which Michael, Samson, Simon and Elijah slept. The room contained two bunk bed like structures constructed of wooden two-by-fours, wooden slats and chicken or rabbit wire. They also contained doors with alarms. The structures were very dark inside and looked like kennels. Johnson also noted the overpowering smell of urine in the entire upstairs of the house. Mr. G. told Johnson which structure was assigned to which child. Johnson noted marks on the wooden slats and Mr. G. explained that Simon had attempted to eat the wood. Johnson also noted that the structure in which Michael slept did not have any mat or mattress, forcing Michael to sleep on the plywood base of the structure. Johnson also did not notice any mattresses, mats or pillows in the other structures.
 {¶ 4} The second bedroom that Johnson saw belonged to Sharen and Abba. It contained two twin beds with bare mattresses and no blankets or pillows. Johnson next saw the room in which River and Jordan slept. Although the single set of bunk beds in *Page 4 
that room was not enclosed as the beds in the first bedroom, the door to the room was constructed of two parts, a lower portion made of wooden slats and an upper portion that was a baby gate. Outside of that room sat a dresser that Mr. G. explained would be pushed in front of the door to prevent the boys from opening the door. Finally, Johnson saw the room in which Serah and Joni slept. That room also contained one set of bunk beds enclosed by wooden slats and chicken wire. Serah slept on the top bunk and Joni slept on the bottom bunk. There was also another bed in the room that the Gs. had planned to use for another child that they hoped to adopt. The chicken wire surrounding Serah's bed had been torn and partially pulled into the enclosure and a wooden board had been nailed on the outside of the hole to prevent Serah from getting out. Johnson then saw Joni peering out through the slats of her enclosure.
 {¶ 5} Upon leaving the home, Johnson called her supervisor, the police department and the prosecutor's office. After obtaining a search warrant, Johnson returned to the home that evening with sheriffs deputies and removed the children from the home. Initially, the children were taken to the hospital for medical evaluations but were then placed in foster homes.
 {¶ 6} On September 12, 2005, appellee filed complaints in dependency, abuse and neglect in the court below regarding each child listed above and seeking temporary custody of the children. After subsequent amendments to the complaints, the allegations regarding each child are as follows. All of the children were alleged to be dependent and River, Jordan, Elijah, Serah, Simon, Joni, Samson and Michael were alleged to be abused *Page 5 
and neglected. In addition, the subsequent amendments included a prayer for temporary or permanent custody. After an emergency shelter care hearing of September 12, 2005, temporary custody of the 11 children was awarded to appellee and appellants were ordered to deliver all medical records, medications and medical appointment information regarding the children to appellee. Subsequently, the lower court further ordered appellants to deliver to appellee a therapy walker, the children's coats, school clothes and personal effects, and the birth certificates, shot records and all other records needed for school purposes regarding Serah, Elijah and Simon.
 {¶ 7} On October 7, 2005, appellee filed the first case plan with the court below. The goal of the plan for all children was reunification. The plan set forth numerous concerns and required appellants to participate in parenting classes and counseling, as well as demonstrate age and developmentally appropriate use of discipline for the children. Appellants, however, refused to sign the plan and the plan was never approved by the lower court.
 {¶ 8} From December 6 to 10, 2005, the case proceeded to an adjudication hearing in the court below. Witnesses who testified for the state included Jo Johnson; Lieutenant Randy Sommers and Detective James Bracken, who executed the search warrant and took photographs of the home; Michael G., appellants' then 13 year old son, who was found competent to testify following a voir dire examination; Dr. William Benninger, a psychologist who performed current psychological assessments of Michael, Simon, Elijah, Samson and Serah; Dr. Keith Hughes, a psychologist who performed *Page 6 
current psychological assessments of Jordan, River, Abba, Sharen and Joni; and Dr. Ronald Hughes, a licensed independent social worker ("LISW") and psychologist who was hired by appellee to help determine the harm or potential harm caused by the cages. Following voir dire, the court below qualified Drs. William Benninger, Keith Hughes and Ronald Hughes to testify as experts regarding whether any harm came to the children as a result of appellants' use of the cages.
 {¶ 9} Upon the execution of the search warrant, Lieutenant Sommers and Detective Bracken took photographs of the interior of appellants' home and the cages. A number of these photographs were admitted into evidence at the hearing below and the officers testified that they accurately depicted the condition of the home when the photos were taken. The photographs reveal enclosures that can best be described as disturbing. The six enclosures were constructed of wooden two-by-fours, some painted, some left bare, and other pieces of what appear to be scrap wood, with plywood floors. Only one enclosure contained a mattress. Each enclosure included a door, some solid, some framed wire. Although the doors did not have locks on them, they did all have alarms. One of the alarms was played in the hearing below and the lower court found in its judgment that it emitted an "extremely loud signal" if the door was opened after the alarm had been set. Four of the enclosures were constructed partially of wire to prevent the children from getting out. As stated above, the wire surrounding Serah's enclosure had been broken and pulled into the sleeping compartment, leaving exposed wires. Lieutenant Sommers testified that the exposed wires protruding into the enclosure were *Page 7 
quite sharp. To "fix" this problem, appellants had nailed a piece of scrap wood on the outside of the enclosure but left the wires protruding into the sleeping compartment.
 {¶ 10} The room occupied by River and Jordan, the door to which was barricaded by a dresser to prevent the boys from escaping, did not include enclosed beds but did house homemade bunk beds constructed of wooden two-by-fours. At the time that the children were removed from the home, River and Jordan were three years old. The top bunk, however, was only guarded by a low two-by-four rail which, Detective Bracken testified, was not sufficient to keep a small child from falling out of bed. The room also included a hole in one of the walls. The hole was several feet above the floor and was slightly bigger than Lieutenant Sommers' fist. Detective Bracken testified that he looked inside the hole and saw electric wires running along a stud approximately one foot from the hole and within easy reach of a small hand.
 {¶ 11} Michael, appellants' 13 year old son, testified at the adjudication hearing about life in the G. family. Michael was adopted by Mr. and Mrs. G. when he was five years old. Michael testified that the caged beds were used for sleeping and as punishment, although Mr. and Mrs. G. told the children that the cages were for safety. Mr. and Mrs. G. installed the cages approximately two years before the children were removed from the G. home. Michael admitted that he did occasionally physically hurt his siblings, once got a lighter and set a piece of paper on fire and was often angry and violent. While his own bed contained two blankets and two sheets, he slept on plywood and had no pillow. None of the other three cages in his room included a mattress. Once *Page 8 
the children were in the enclosures for bed, the alarms would be set. If anyone opened the door and set off the alarm they had to have a good reason for getting up, such as to use the bathroom, or they would get in trouble. The alarms would wake up the household. Michael stated that at times he would need to use the bathroom but did not want to set off the alarm. On those occasions he would often urinate in his cage. When he, or any of the children, urinated in their beds, they were forced to stand outside in their wet pajamas with no coat or shoes regardless of the weather, until everyone else in the family was done using the bathroom.
 {¶ 12} Regarding use of the cages as punishment, Michael stated that Samson would be sent to his cage at least three times a week. When one of the children was sent to their cage as punishment, the alarm would be set. Michael stated that one time he had to stay in his cage for two weeks as punishment for taking a jar of peanut butter, cereal, a loaf of bread and a butter knife from the kitchen. On another occasion, Michael was sent to his cage and ordered to write out by hand the entire Book of Deuteronomy. He was not allowed to leave his cage, except for meals and bathroom breaks, until he finished. It took him several weeks. Michael further testified that on another occasion, he was forced to sleep in the bathtub for 81 days in an effort to cure his bedwetting problem. Other punishments imposed by Mr. and Mrs. G. included pushing Joni's head in the toilet and giving her a "swirly" as punishment for drinking out of the toilet. It is worth noting here that Joni has Down's Syndrome. Similarly, Serah was punished in this manner for urinating in her bed. *Page 9 
 {¶ 13} At the adjudication hearing below, the court, over objections from appellants' counsel, qualified Drs. William Benninger, Keith Hughes and Ronald Hughes to testify as experts on the issue of whether the caged beds were abusive. Dr. Benninger and Dr. Keith Hughes performed psychological evaluations of the children as noted above. Both psychologists testified that RAD is extremely rare when properly diagnosed and that while the children did have some developmental, neurological and learning disorders, none of them had RAD.
 {¶ 14} Dr. Benninger further testified that isolation and the use of cages and alarms would have made the conditions that the children did have worse, including increasing disruptive behavior, anxiety and emotional difficulty. In Dr. Benninger's opinion, the cages likely caused psychological harm to the children. Similarly, Michael's being forced to sleep in the bathtub for an extended period of time was, in Dr. Benninger's opinion, harmful to him. In addition to the harm caused by the cages and punishments imposed by Mr. and Mrs. G., Dr. Benninger opined that because the children were home schooled and attended church services at home, they were further isolated from society.
 {¶ 15} Similarly, Dr. Keith Hughes testified that none of the children he evaluated had psychological disturbances or behavior characteristics which would require restraints. Indeed, with regard to Joni, Dr. Hughes testified that children with developmental delays particularly require specific stimulation and that there was a great potential for harm when such children are isolated and restrained. In particular, he stated that such isolation *Page 10 
and restraint could lead to self-stimulatory behaviors such as PICA (ingestion of nonfood articles), and picking at themselves and at walls. Dr. Hughes opined that the children he evaluated were specifically harmed by the cages because they impaired their development.
 {¶ 16} Dr. Ronald Hughes, a psychologist and LISW, was hired by appellee to do a risk assessment and determine the degree of abuse in the present situation. He too concluded that none of the G. children were appropriate candidates for such restrictive enclosures. Although he too believed that the children were misdiagnosed with RAD, he testified that if the children did have RAD, the use of the cages was particularly harmful because RAD children need a warm, sensitive, patient adult to contradict their expectation that adults are disinterested, abusive or unpredictable in their attachment relationships with them. He further noted that restrictive enclosures were only warranted in extreme cases and should only be used in psychiatric facilities where the patient could be continually monitored by mental health professionals. Dr. Hughes opined that the cages used in the present case were a threat to the children's physical safety and to their psychological development. More importantly, Dr. Hughes opined that the cages represented a serious lack of understanding of the children's developmental needs and a lack of capacity to formulate and implement appropriate parenting strategies for the children by appellants. In Dr. Hughes' opinion, the G. family was out of control and Mr. and Mrs. G. used the cages to provide structure. *Page 11 
 {¶ 17} In their defense, appellants called Elaine Thompson, the children's therapist since 2001, to testify regarding the children's behaviors. Although Thompson admitted to recoiling upon first seeing the enclosures, she did not believe that they constituted abuse or neglect or created a dependency, and believed that they were for the children's safety. She also insisted throughout her testimony that a number of the children, included Michael, had RAD and that RAD children typically lie. In support of her diagnosis of RAD for Michael and Sharen, Thompson testified that both children were diagnosed with that disorder in 2001, at the Child Adolescent Psychiatric Unit of the Medical College of Ohio. No document was admitted into evidence, however, to substantiate this diagnosis.
 {¶ 18} On December 22, 2005, the lower court issued a judgment finding that, based on clear and convincing evidence, River, Jordan, Elijah, Serah, Simon, Joni, Samson and Michael were abused children as defined by R.C. 2151.031(B) because they were endangered as defined by R.C.2919.22(A) and (B)(4) and that Michael was also an abused child as defined by R.C. 2151.031(D). The court further found by clear and convincing evidence that all of the G. children were dependent pursuant to R.C. 2151.04(C) in that their conditions and environment were such as to warrant the state, in the interests of the children, in assuming the children's guardianship, and that Mercy Anne, Abba and Sharen were dependent pursuant to R.C. 2151.04(D)(1) and (2) because as household residents they were in peril of being exposed to the same disciplinary techniques and environment that led to certain of their siblings being endangered. The court did not find that River, Jordan, Elijah, Serah, Simon, Joni, Samson or Michael were *Page 12 
neglected as proscribed by R.C. 2151.03(A)(2), and so dismissed the neglect allegations with regard to those children.
 {¶ 19} Initially, the case proceeded to the disposition hearing on January 18, 2006. At that time, however, appellee informed the court that it was then intending to seek permanent custody of the G. children and moved to continue the hearing. As a result, the court issued a judgment on January 20, 2006, which in relevant part continued the hearing, ordered appellants to submit to sex offender risk assessments and follow through with any and all recommended treatment and/or counseling, ordered appellants to sign the appropriate releases for background checks, ordered appellants to cooperate with appellee regarding submission of the children's vaccination records, social security cards and person effects, and ordered appellants to submit to psychological assessments and follow through with any and all recommended treatment and/or counseling.
 {¶ 20} On February 22, 2006, the disposition hearing began. Throughout the hearing, one issue of controversy was the admission of records (collectively referred to at the hearing below and herein as the "Lorain County documents") that appellee obtained from Lorain County Children Services ("LCCS") which documented Mr. and Mrs. G's. history with children services in that county regarding their own biological children. The Lorain County documents were referred to by many witnesses at the hearing and had been reviewed by witnesses in making recommendations regarding whether the children could or should be returned to Mr. and Mrs. G. and regarding the best interests of the children. Appellants' counsel objected to their admission and all parties filed briefs on *Page 13 
the issue. In a separately written decision and judgment entry, the lower court found that the documents were admissible. Accordingly, references to the documents by the various witnesses were considered by the trial court in reaching a determination on the ultimate issues. The Lorain County documents reveal the following.
 {¶ 21} On September 12, 1986, Mr. G. called the LCCS to self-refer that he had sexually abused his daughter Jenna G., then age 12, for the past two years. The abuse included fondling above the waist, over the clothing. That same day, Mr. G. and Jenna both came to LCCS and gave taped statements substantiating the abuse. The LCCS referred Mr. G. and Jenna to group and individual therapy. Jenna was removed from the home and went to live with an aunt and uncle. Prosecution of Mr. G., however, was not pursued because two sons, Jesse and Timothy, remained in the home and Jenna's mother had recently died. On March 17, 1987, Mr. G. signed a "therapy contract" in which he agreed to participate in the STOP/Parents United Treatment Program and signed an acknowledgment that reads in part: "I am participating in STOP to control my inappropriate sexual behavior toward children and I wish to be held fully accountable for my behavior. I agree to stop all molesting behavior." Shortly thereafter, Mr. G. met Mrs. G. at a STOP function (Mrs. G.'s daughter Lisa had been molested by Mrs. G.'s former husband) and the two married in May 1987. Jenna moved back in with the new blended family in June 1987 and in July 1987, Mr. G. stopped attending the STOP treatment program. Mr. and Mrs. G. subsequently adopted each other's children. The family then included Mr. G.'s children, Jesse (age 14), Jenna (age 13) and Timothy (age 11), and Mrs. *Page 14 
G.'s children, Lisa (age 17) and Joe (age 14). The family did not flourish. On May 31, 1991, the juvenile court gave custody of Timothy, then aged 14, to LCCS for placement after appellants refused to allow him to return home. In June 1991, Jenna ran away from home to the Junction Runaway Shelter because of severe conflicts between herself and both Mr. and Mrs. G. An LCCS social summary dated July 23, 1991, states: "Parents have refused requests by Junction Runaway Shelter to meet and discuss conflicts. Parents are often hard to get a hold of and rarely return calls." The summary further states: "This family has had a history of forcing their children out of the home so they do not have to deal with their unruly or delinquent behavior."
 {¶ 22} Jenna G. and Jesse G. testified at the hearing below about life with Mr. and Mrs. G. Jenna confirmed that she had been sexually abused by her father and that the molestation began when she was eight or nine years old. After living with her aunt and uncle for about one year, she returned to live with appellants after they married. Although life in appellants' home was okay at first, Jenna testified that it soon began to unravel. Eventually, all of the children were kicked out of the house by appellants. Lisa was the first to be evicted when she was a senior in high school. Joe was kicked out shortly after Jenna moved back home. Timothy had a number of emotional issues and was deeply affected by his mother's death. When appellants could no longer handle Timothy's behavioral problems, they directed Jesse to walk Timothy down the street to the Junction Runaway Shelter. Timothy never moved back into the G.'s home and emancipated from a group home. Shortly after Timothy left, appellants threw Jesse's *Page 15 
belongings onto the front yard and he too was evicted. Finally, when she was 16 years old, Jenna too ran away and eventually emancipated from a group home. Jenna testified that she had not seen Mrs. G. for eight years and had not seen Mr. G. for four years. When she did see Mr. G, however, he told her he had put himself into counseling because he was beginning to have thoughts of sexually abusing Abba.
 {¶ 23} The lower court also heard from the various social workers and caseworkers who had worked with the G. family since the children were removed from the home. Not one caseworker or social worker described appellants as cooperative. Despite the previous court order, appellants had not yet signed releases for background checks, and had not yet submitted to sex offender risk assessments or psychological evaluations. They had not provided caseworkers with up-to-date vaccination records for Serah, Simon or Elijah, so those children had to be re-vaccinated before they could attend school. When social workers visited appellants at their home several weeks before the disposition hearing, they requested to see the children's bedrooms but the request was denied. Indeed, Mrs. G. told the caseworkers that they could see the rooms on the news. Although appellants did attend a number of visitations with the children, the caseworkers testified that appellants were often inappropriate with the children, discussing matters of the case with them after being directed not to, and showed favoritism toward Abba, to the exclusion of the other children.
 {¶ 24} The caseworkers also testified about the children's adjustment to their foster homes and life away from appellants. All of the children are forming strong, healthy *Page 16 
bonds with their foster families and most are adjusting well to being in public school. Mercy Anne, who was born with severe medical problems, has exceeded the expectations of her doctors. Her caseworker testified that her growth and development have been overwhelming since her removal from appellants' home. The children had been attending sibling visitations with each other once a week and the caseworkers testified that those visits go well and that for the most part the children truly enjoy each other's company. With regard to the children's wishes, only Abba expressed a desire to return to appellants.
 {¶ 25} Although appellee initially sought temporary custody of the G. children, with a goal of reunification, the caseworkers agreed that after receiving and reviewing the Lorain County documents in December 2005, they concluded that permanent custody was the only solution to the case. All of the caseworkers testified that permanent custody was in the best interest of the G. children.
 {¶ 26} At the disposition hearing below, appellee again called Drs. Hughes, Benninger and Hughes to testify as expert witnesses. Dr. Ronald Hughes testified regarding the future risk of abuse to the G. children should they be returned to appellants. Drs. Keith Hughes and William Benninger testified about their evaluations of the children specifically and their opinions regarding the best interests of the children. Over the objection of appellants' counsel, the court qualified Dr. Ronald Hughes to testify as an expert on the issue of whether the children could or should be placed with appellants within a reasonable time and qualified Drs. Keith Hughes and William Benninger to testify as experts on the best interests of the children. *Page 17 
 {¶ 27} Dr. Ronald Hughes testified that in his opinion the likelihood of abuse in the G. home was high if the children were returned to the home. He based his opinion in part on the prior service history of the parties in Lorain County, the inappropriate discipline used by the Gs. with no insight into their behaviors and no expressed inclination to change, and the history of sexual abuse in the family regarding their own biological children. He particularly noted that when he visited appellants at their home, they did not seem to recognize the potential emotional harm that the cages could cause the children and felt that they were being mistreated by the HCDJFS.
 {¶ 28} Drs. Benninger and Keith Hughes had conducted psychological evaluations of the children and observed visitations between appellants and the children. They too opined that the likelihood of a recurrence of abuse was high if the children were returned to appellants' home. Both doctors noted that appellants demonstrated a lengthy history, beginning with their own biological children, of an inability to make appropriate parenting decisions and punishing their children with isolation and overly punitive discipline. Both doctors concluded that permanent custody was in the best interest of the children.
 {¶ 29} Finally, Margaret Kern, the guardian ad litem, testified at the disposition hearing below. Kern spent a great deal of time with the G. children since they were removed from appellants' home. Despite three requests, appellants refused to meet with her. She attended the visitations between appellants and the children as well as the sibling visits. In her opinion, appellants had not taken any steps to acknowledge the *Page 18 
abuse and dependency issues. Kern testified that since being removed from the home, the children had made great progress in their socialization and communication skills and that the risks to the children if they were returned to appellants' home were too great. She therefore recommended that permanent custody of the children be granted to appellee.
 {¶ 30} In addition to the witnesses presented by appellee, appellants called a number of witnesses to testify on their behalf, including Mrs. G. None of the witnesses presented any compelling testimony that would support a decision to return custody of the children to appellants.
 {¶ 31} On March 20, 2006, the lower court issued a judgment entry terminating the parental rights of Mr. and Mrs. G. and awarding permanent custody of River, Jordan, Elijah, Serah, Simon, Abba, Joni, Samson, Michael and Sharen to appellee. Because appellants' attempted adoption of Mercy Anne had not been completed, the court ordered that temporary custody of her remain with appellee. Pursuant to R.C.2151.353(A)(4) and 2151.414(E)(14) and (15), the court found by clear and convincing evidence that the children cannot and should not be placed with either parent within a reasonable time and that, pursuant to R.C. 2151.414(D), an award of permanent custody of the adopted G. children was in their best interest. The court also made specific findings with regard to Mercy Anne that will be addressed infra. Appellants now challenge that judgment on appeal through the following assignments of error:
 {¶ 32} "Assignment of Error 1: The trial court erred by allowing the state's experts to testify in the adjudicatory hearing and in allowing inadmissible testimony. *Page 19 
 {¶ 33} "Assignment of Error No. 2: The trial court erred by finding the G[.] children were abused and dependent.
 {¶ 34} "Assignment of Error No. 3: The trial court erred by allowing the state's experts to testify in the dispositional hearing.
 {¶ 35} "Assignment of Error No. 4: The trial court erred by admitting evidence from the `Lorain County' files and other social history information.
 {¶ 36} "Assignment of Error No. 5: The trial court erred by granting permanent custody of ten of the G[.] children to the county and by granting temporary custody of Mercy Anne to the county."
 {¶ 37} Appellants' first and third assignments of error are related and will be addressed together. Appellants challenge the trial court's decision to permit Drs. Hughes, Benninger and Hughes to testify as expert witnesses at the adjudication and disposition hearings below.
 {¶ 38} In In re Baby Girl Doe, 149 Ohio App.3d 717, 2002-Ohio-4470, ¶ 73-74, we discussed the standards applicable to reviewing a trial court's determination that a witness is qualified to testify as an expert:
 {¶ 39} "The determination of whether a witness is qualified to offer testimony as an expert is within the sound discretion of the trial court. This discretion is not unlimited, but is subject to the provisions of the Rules of Evidence. Specifically, the expert should possess specialized, technical, or scientific knowledge. Evid.R. 702;Columbus v. Dawson (1986), 28 Ohio App.3d 45, 46-47 * * * . Additionally, the proffered testimony *Page 20 
should assist the trier of fact in understanding the evidence or in determining a factual issue and be relevant to the case. State v.Williams (1983), 4 Ohio St.3d 53, * * * syllabus. As to this latter requirement, the expert's testimony is relevant insofar as it is reliable. Williams, supra, at 57-59 * * *; State v. Minor (1988),47 Ohio App.3d 22, 25 * * *. In State v. Nemeth (1998), 82 Ohio St.3d 202,210 * * *, the Ohio Supreme Court noted that the Staff Note to Evid.R. 702 `reinforced the directive that questions of reliability are to be directed at principles and methods used by an expert in reaching his or her conclusions, rather than trying to determine whether the conclusions themselves are correct or credible.'
 {¶ 40} "Under Evid.R. 702, a witness may be qualified as an expert by reason of knowledge, skill, experience, training, or education. While Evid.R. 702 permits expert testimony, a threshold determination must first be made under Evid.R. 104(A) concerning the qualifications of an individual to testify as an expert witness. Vinci v. Ceraolo (1992),79 Ohio App.3d 640, 645-646 * * *. The decision that a witness is or is not qualified to testify as an expert is a matter within the sound discretion of the trial court, and a court's ruling thereon will not be reversed unless there is a clear showing of an abuse of this discretion.Alexander v. Mt. Carmel Med. Ctr. (1978), 56 Ohio St.2d, 155, 157 * * *;State v. Awkal (1996), 76 Ohio St.3d 324, 331-332 * * *; State v.Clark (1995), 101 Ohio App.3d 389, 411 * * *."
 {¶ 41} At the adjudication hearing below, the lower court determined that Drs. William Benninger, Keith Hughes and Ronald Hughes were qualified to testify as experts *Page 21 
on the issue of whether the caged beds were abusive. All three men were imminently qualified psychologists with vast experience and training in child psychology. Indeed, appellants never challenged the witnesses qualifications as experts in the field of child psychology. Rather, they challenged the witnesses' ability to testify on the issue of whether the caged beds constituted abuse. Throughout the proceedings below, and through the testimony of the children's therapist Elaine Thompson, appellants attempted to establish that most of the children had severe behavioral and developmental problems that required putting them in cages for the safety of themselves and the other children. Accordingly, the psychological and behavioral problems of the children, and the proper as well as improper treatments for those disorders, were clearly issues that the lower court needed to consider. The testimony of these witnesses assisted the court in understanding how isolation and the use of cages and alarms likely affected the children and therefore assisted the court in determining whether the children were abused and/or dependent.
 {¶ 42} We therefore cannot say that the lower court abused its discretion in allowing Drs. Keith Hughes, William Benninger and Ronald Hughes to testify as expert witnesses at the adjudication hearing below and the first assignment of error is not well-taken.
 {¶ 43} Appellants further challenge the trial court's decision to allow the same witnesses to testify as experts at the disposition hearing below. At the disposition hearing, the ultimate issues for the court's determination were whether the children could *Page 22 
be placed with appellants within a reasonable time or should be placed with appellants and whether permanent custody was in the best interest of the children. In concluding that the children could not be placed with appellants within a reasonable time and should not be placed with appellants, the court looked to the factors in R.C. 2151.414(E). Because the court had previously determined that appellants had committed abuse as described in R.C. 2151.031, the court examined the factors set forth in R.C. 2151.414(E)(14) and (15). The court therefore needed to determine whether appellants were unwilling to prevent the children from suffering abuse and whether the likelihood of recurrence of abuse made the children's placement with appellants a threat to the children's safety. The testimony of the three expert witnesses assisted the court in reaching a decision as to whether abuse was likely to recur. Evid.R. 702 reads in relevant part:
 {¶ 44} "A witness may testify as an expert if all of the following apply:
 {¶ 45} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 46} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 47} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *." *Page 23 
 {¶ 48} As is evident from its decision and judgment entry of March 20, 2006, the lower court looked to these experts to help it determine the likelihood of future abuse to the children should they be returned to appellants. The witnesses' testimony in this regard related to matters of psychological harm and was based on years of training, education and reliable scientific information. We cannot conclude that the court abused its discretion in allowing these witnesses to testify as experts in this regard and the third assignment of error is not well-taken.
 {¶ 49} In their second assignment of error, appellants challenge the trial court's findings that the children were abused and/or dependent. Findings of abuse and dependency must be supported by clear and convincing evidence. R.C. 2151.35(A). Clear and convincing evidence is that evidence "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 50} R.C. 2151.031 defines an "abused child" in relevant part as a child who:
 {¶ 51} "(B) Is endangered as defined in section 2919.22 of the Revised Code, except that the court need not find that any person has been convicted under that section in order to find that the child is an abuse child; [or]
 {¶ 52} "* * *
 {¶ 53} "(D) Because of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare."
 {¶ 54} The child endangerment statute, R.C. 2919.22, provides in pertinent part: *Page 24 
 {¶ 55} "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *
 {¶ 56} "(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
 {¶ 57} "* * *
 {¶ 58} "(4) Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development[.]"
 {¶ 59} The trial court found that Michael, Serah, Simon, Elijah, Samson, Joni, Jordan and River were abused because they were endangered as defined in R.C. 2919.22(A) and (B)(4) and that Michael was also abused as defined by R.C. 2151.031(D). Upon a thorough review of the evidence in this case as set forth above, we find that the trial court's findings of abuse were supported by clear and convincing evidence.
 {¶ 60} We similarly find that the trial court's findings of dependency were supported by clear and convincing evidence. As used in R.C. Chapter 2151, a "dependent child" includes any child: *Page 25 
 {¶ 61} "(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship; [or]
 {¶ 62} "(D) To whom both of the following apply:
 {¶ 63} "(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child;
 {¶ 64} "(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household." R.C. 2151.04
 {¶ 65} The trial court found that the conditions and environment of all of the children were such as to warrant the state, in the interests of the children, in assuming the children's guardianship. The court described this environment as follows: "This environment was created by a combination of many factors, such as: six of the children slept in and were punished in boxes rigged with extremely loud alarms; one box contained a hole in the mesh wiring that even after rudimentary repair left sharp wires protruding into the box; two other children (each aged three) were at times barricaded in their room in which electrical wires were exposed in a wall and in reach; humiliating discipline was administered; the upstairs in general and several boxes in particular contained an overwhelming odor of urine; several of the children had sparse bedding; the *Page 26 
upstairs contained no working smoke detectors; and, the fact that the eleven children's adoptive parents were `overwhelmed' by the challenge of maintaining order in the home."
 {¶ 66} Because the trial court's findings of abuse and dependency were supported by clear and convincing evidence, the second assignment of error is not well-taken.
 {¶ 67} In their fourth assignment of error, appellants contend that the trial court erred in admitting the Lorain County documents into evidence at the disposition hearing below. As discussed above, the Lorain County documents reveal the service history of Mr. and Mrs. G. and their own biological children when they lived in Lorain County. Throughout the disposition hearing, appellants' counsel objected to their admission as hearsay and objected to any reference to the documents by any testifying witnesses who had reviewed the documents. Appellants also objected to their admission on the ground that their dissemination violated certain privacy laws. The lower court ruled that LCCS's dissemination of the records to its Huron County counterpart was not only authorized but required by the Ohio Administrative Code. Appellants do not challenge that ruling on appeal. The court further held that the five specific documents at issue were either not hearsay or were otherwise admissible pursuant to a recognized exception to the hearsay rule. This is the ruling that appellants now challenge on appeal.
 {¶ 68} A trial court has discretion to determine which evidence to admit or exclude at trial, and such decisions will not be reversed on appeal absent an abuse of discretion. State ex rel. Van Dyke v. Pub.Emp. Retirement Bd, 99 Ohio St.3d 430, 2003-Ohio-4123, ¶ 43. *Page 27 
 {¶ 69} Hearsay is defined in Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Evid.R. 801(A).
 {¶ 70} We first note that state's exhibit No. 1 is a certification of records affidavit signed by Jeannie Weisbrod, the records custodian of LCCS, which certified that the attached records, state's exhibits Nos. 2 to 6, were true and authentic copies of LCCS records regarding the G. family. Weisbrod further attested that the records were prepared and maintained in the usual course of business at the office of LCCS. Moreover, Weisbrod testified below that the documents were complete and accurate copies of the records maintained by LCCS regarding the G. family. State's exhibit No. 2 is the Ohio Central Registry of Child Protection Child Abuse/Neglect Report, dated September 12, 1986. State's exhibit No. 3 is a Notification of Child Abuse or Neglect form used by LCCS and dated September 25, 1986. State's exhibit No. 4 is the Therapy Contract signed by Mr. G. acknowledging his inappropriate sexual behavior toward children and agreeing to participate in the STOP program. It is dated March 17, 1987. State's exhibit No. 5 is a letter from Pat Manns-Birmingham, the STOP program coordinator to Mr. G., dated August 19, 1987, in which Manns-Birmingham expresses her concern that Mr. G. and Jenna had dropped out of the STOP program. R. Scott Kelly, who had been a social worker at LCCS during the relevant time in question, testified at the hearing below that such letters were typically maintained in the LCCS file as part of the report from the *Page 28 
therapist working with the family. Finally, State's exhibit No. 6 is a social summary of the G. family's history with LCCS prepared by R. Scott Kelly, approved by Susan Deppisch, his supervisor, and dated July 23, 1991. Kelly testified that he prepared the document and that such documents were typically prepared and maintained in LCCS files to document a family's history with the agency.
 {¶ 71} Upon review, it is clear that state's exhibits Nos. 2, 3, 5 and 6 were clearly hearsay. We agree with the trial court, however, in finding that these exhibits were subject to the hearsay exception for business records. Evid.R. 803(6) excepts from the hearsay rule: "Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term `business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit." The testimony and affidavit of Jeannie Weisbrod, the custodian of the records, established that these exhibits were kept in the regular course of business at LCCS and that it was the regular practice of that business to create these records. Moreover, appellants have not established, and did not establish *Page 29 
below, that the source of information or the method or circumstances of preparing the records indicated a lack of trustworthiness. Indeed, Jenna G. and Jesse G. both testified at the disposition hearing regarding Mr. G.'s sexual abuse of Jenna and the family's history with LCCS. The court therefore did not abuse its discretion in admitting state's exhibits Nos. 2, 3, 5, and 6.
 {¶ 72} We further find that the court did not abuse its discretion in admitting state's exhibit No. 4, the therapy contract. That document was not hearsay but, rather, constituted an admission by a party-opponent. See Evid.R. 801(D)(2).
 {¶ 73} Accordingly, the lower court did not err in admitting into evidence the Lorain County documents and the fourth assignment of error is not well-taken.
 {¶ 74} In their fifth assignment of error, appellants assert that the lower court erred in granting appellee permanent custody of their ten adopted children and in awarding appellee temporary custody of Mercy Anne.
 {¶ 75} The disposition of a child determined to be dependent or abused is controlled by R.C. 2151.353 and the court may enter any order of disposition provided for in R.C. 2151.353(A). Before the court can grant permanent custody of a child to a public children services agency, however, the court must determine: (1) pursuant to R.C. 2151.414(E) that the child cannot be placed with one of his parents within a reasonable time or should not be placed with one of his parents; and (2) pursuant to R.C. 2151.414(D), that the permanent commitment is in the best interest of the child. R.C. 2151.353(A)(4). R.C. 2151.414(E) provides that, in determining whether a child cannot *Page 30 
be placed with a parent within a reasonable time or should not be placed with a parent, the court shall consider all relevant evidence. If, however, the court determines by clear and convincing evidence that any one of the 16 factors listed in the statute exist, the court must find that the child cannot be placed with the parent within a reasonable time or should not be placed with the parent. Those factors include:
 {¶ 76} "(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 {¶ 77} "(15) The parent has committed abuse as described in section2151.031 [2151.03.1] of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood or recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety."
 {¶ 78} In determining the best interest of the child, R.C. 2151.414(D) directs that the court shall consider all relevant factors, including, but not limited to:
 {¶ 79} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care-givers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 80} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; *Page 31 
 {¶ 81} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 82} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 83} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 84} In reviewing the evidence before it, the lower court found clear and convincing evidence that appellants have demonstrated and continue to demonstrate an unwillingness to prevent the children from suffering physical, emotional, or sexual abuse, that appellants committed abuse as described in R.C. 2151.031, and that the seriousness, nature or likelihood or recurrence of the abuse made the children's placement with appellants a threat to the children's safety. Accordingly, the lower court found that the adopted children could not be placed with appellants within a reasonable time or should not be placed with appellants. Upon a thorough review of the record, we conclude that these findings were supported by clear and convincing evidence. The physical and emotional abuse suffered by many of the children has already been discussed above and need not be repeated here. What is worth noting, however, is that upon reviewing the lengthy transcript from the proceedings below, we are left with the clear impression from *Page 32 
nearly all of the witnesses whose testimony was relevant to these issues, that Mr. and Mrs. G. still do not believe that they did anything wrong. The trial court found this to be a very important factor in concluding that abuse was likely to recur if the children were returned to appellants. Indeed, as is clear from the following passage from the court's decision and judgment entry, the court found appellants' lack of insight to be significant in concluding that the children cannot and should not be returned to appellants: "The G[s.] in response [to efforts of the agency at reunification] have unfortunately been uncooperative, if not hostile, to the Department of Job and Family Services. This attitude can be attributed to the G[s.'] continuing unwillingness to accept or understand that the children were being harmed and detrimentally affected by the discipline and environment in the G[.] home prior to their removal in September 2005. This lack of insight and understanding, as described above, supports the decision that the children cannot and should not be returned to the G[.] home."
 {¶ 85} Similarly, there was clear and convincing evidence to support the trial court's conclusion that an award of permanent custody of the adopted children to appellee was in those children's best interest. The court considered the interaction and interrelationship of the children with each other, with appellants, and with their current foster families. The court also considered the children's wishes and noted that of those who were old enough to express a preference, only Abba demonstrated a consistent desire to return to the Gs.' home. The others were either ambivalent or strongly desired not to return to appellants' home. The court further considered the custodial history of the *Page 33 
children and the need for the children to have a legally secure placement as soon as possible. The court then noted that such a secure placement could not be achieved by pursuing a reunification plan with appellants when there was a likelihood of a recurrence of abuse in the G. home. Finally, the court expressly declined to find any of the factors listed in R.C. 2151.414(E)(7) to (11).
 {¶ 86} As there was clear and convincing evidence to support the trial court's findings that the ten adopted children could not be placed with appellants within a reasonable time and should not be placed with appellants and that an award of permanent custody was in the children's best interest, the trial court did not err in terminating appellant's parental rights.
 {¶ 87} With regard to Mercy Anne, although appellants had legal custody of her they never had parental rights to her so the standards set forth in R.C. 2151.414, and the clear and convincing evidence standard, do not apply. Rather, R.C. 2151.353(A)(2) provides if a child is adjudicated a dependent child, the court may commit the child to the temporary custody of a public children services agency. Matters within the court's discretion will not be reversed on appeal absent an abuse of that discretion.
 {¶ 88} In the proceedings below, the court determined that it was in Mercy Anne's best interest to be placed in the temporary custody of the HCDJFS. It reached this conclusion after expressly finding that Mercy Anne is a two-year-old child with special medical needs; that she was placed with appellants as a result of an incomplete and inaccurate home study completed by Adopt America Network; that the home study failed *Page 34 
to disclose material information concerning appellants and their home; that pre-adoptive placement with appellants is no longer appropriate or in Mercy Anne's best interest; that Mercy Anne has lived with appellants since August 2004, and all of her medical providers are in Ohio; that since her removal from appellants' home, Mercy Anne has done extremely well in a foster-to-adopt home in Huron County; that appellants are not appropriate adoptive parents; and that Mercy Anne is receiving Medicaid as a result of her status as a ward of Huron County Children Services, which is necessary for her treatment. Upon review, and in consideration of these facts as well as the facts regarding the adopted G. children, we cannot find that the lower court abused its discretion in awarding temporary custody of Mercy Anne to appellee.
 {¶ 89} The fifth assignment of error is not well-taken.
 {¶ 90} On consideration whereof, the court finds that substantial justice has been done the parties complaining and the judgment of the Huron County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Huron County.
 JUDGMENT AFFIRMED. *Page 35 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., and Thomas J. Osowik, J. CONCUR.
[1] Because two of the children are also named Michael and Sharen, and to prevent confusion, appellants will be referred to as Mr. and Mrs. G. or appellants.
[2] RAD was defined at the adjudication hearing below as "a markedly disturbed and developmentally inappropriate social relatedness in most contexts beginning before the age of five years." *Page 1